1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   DEEP9 CORPORATION,                        CASE NO. C11-0035JLR

11                         Plaintiff,          ORDER GRANTING
                                               SUMMARY JUDGMENT
12                 v.

13   BARNES & NOBLE, INC., et al.,

14                         Defendants.

15                          **I.      INTRODUCTION**

16        This matter comes before the court on Defendants Barnes & Noble, Inc. and

17   barnesandnoble.com, LLC's (collectively, "Barnes & Noble") motion for summary

18   judgment of non-infringement and invalidity.  (Mot. (Dkt. # 146).)  Having considered

19   Barnes & Noble's motion, Plaintiff Deep9 Corporation's ("Deep9") response (Resp.

20   (Dkt. # 156)), Barnes & Noble's reply (Reply (Dkt. # 196)), all attachments to the briefs,

21   the balance of the record, and the governing law, and having heard oral argument on

22   September 11, 2012, the court GRANTS Barnes & Noble's motion (Dkt. # 146).

ORDER- 1

## II.   FACTUAL BACKGROUND

David Campbell is the sole inventor of United States Patent Nos. 5,937,405 ("the '405 Patent") and 6,377,951 ("the '951 Patent") (collectively, "the Patents-in-Suit"), which were first assigned to Punch Networks Corporation and then assigned to Deep9, the current assignee.  (*See* U.S. Patent Nos. 5,937,405 ('405 Patent) & 6,377,951 ('951 Patent).)  Mr. Campbell is the sole shareholder, officer, and director of Deep9.  Deep9 contends that Barnes & Noble's Nook 1st Edition, Nook Color, Nook Simple Touch, and Nook Tablet devices, along with Barnes & Noble's servers (collectively, the "Accused Devices") infringe claims 1, 2, 4, 6, 8, 24, 27, 30, and 40 of the '405 Patent and claims 9-11, 13, 17, 18, 21-25, 27-32, 35-37, and 41-43 of the '951 Patent.[1]  (*See* Sealed Dunne Decl. (Dkt. # 149) Ex. 3 ("Goldberg Rebuttal Rpt.") ¶ 20.)

### A.   The Patents-in-Suit

Both Patents-in-Suit claim priority from an application filed by Mr. Campbell on May 25, 1995, which would eventually issue as U.S. Patent No. 5,694,596 ("the '596 Patent").  (*Markman* Order (Dkt. # 60) at 5.)  The '405 Patent is a continuation of that application, and the '951 Patent is a continuation of the '405 Patent.  Therefore, the Patents-in-Suit share a specification with each other, as well as with the '596 Patent.  (*Id.* at 5-6.)  The Patents-in-Suit recite methods and apparatuses for online updating of databases via a network.  (*Id.* at 2.)  Both patents describe an invention involving the updating of information in a network including two or more devices, such as computer

---

[1]Claims 1, 24, and 40 of the '405 Patent and claims 9, 18, 27, and 35 of the '951 Patent are independent.  (*See* '405 Patent & '951 Patent.)

terminals, and a communications channel connecting the devices.  (*See* Abstract, '405 Patent, '951 Patent.)  The Patents-in-Suit often name the devices within the network as "user terminals" or "host terminals."  When one device on the network becomes updated with new information (the host terminal), the disclosed inventions generally teach a system or method for downloading, via the communications channel, the new information to the remaining devices (user terminals) on the network.  ('405 Patent at 11:24-26.)

Claim 1 of the '405 Patent is a representative method claim with respect to most of the disputes in this case:

> 1.     A method for updating modules of information via a network comprising a plurality of terminals, the method comprising:
>
> (a) identifying a first module containing information to be updated, wherein the first module is stored in memory of a first terminal, and wherein the first module comprises a plurality of first module blocks;
>
> (b) identifying a second module containing more recent information than the first module, wherein the second module is stored in memory of a second terminal, and wherein the second module comprises a plurality of second module blocks;
>
> (c) identifying which second module blocks contain more recent information than the first module blocks;
>
> (d) downloading via the network the identified second module blocks from memory of the second terminal to the first terminal; and
>
> (e) updating the first module stored in memory of the first terminal with the more recent information contained in the identified second module blocks downloaded from memory of the second terminal.

(*See* '405 Patent.)

ORDER- 3

Claim 24 of the '405 Patent is representative of a system claim of the Patents-in-Suit:

24.    A computer readable medium encoded with a set of executable instructions to perform a method for updating modules of information via a common communication channel interconnecting a plurality of terminals, the method comprising:

(a) identifying a first module containing information to be updated, wherein the first module is stored in memory of a first terminal, and wherein the first module comprises a plurality of first module blocks;

(b) identifying a second module containing more recent information than the first module, wherein the second module is stored in memory of a second terminal, and wherein the second module comprises a plurality of second module blocks;

(c) identifying which second module blocks contain more recent information than the first module blocks;

(d) downloading via the common communication channels the identified second module blocks from memory of the second terminal to the first terminal; and

(e) updating the first module stored in memory of the first terminal with the more recent information contained in the identified second module blocks downloaded from memory of the second terminal.

(*See* '405 Patent.)  Claim 24 precisely embodies the method disclosed in Claim 1 of the '405 Patent as a readable medium encoded with a set of executable instructions to perform the method of Claim 1.

Claim 35 of the '951 Patent is representative of a method claim that includes the terms "host computer" and "user computer":

35.    A method of updating a plurality of user modules of information via a common communications channel interconnecting a host computer and a user computer, the user computer having a user memory for storing user modules, each user module including a plurality of user module blocks, the

host computer having a host memory for storing host modules, each host module including a plurality of module blocks, the method comprising:

(a) identifying a first user module stored in user memory, wherein at least one first user module block of the first user module comprises a second user module of information;

(b) identifying a first host module stored in host memory that corresponds to the first user module, wherein each first host module block corresponds to a first user module block, wherein at least one first host module block comprises a second host module of information, and wherein the second host module corresponds to the second user module;

(c) comparing the first host module to the first user module to determine if the first host module contains more recent information;

(d) if the first host module contains more recent information, comparing each first host module block to the corresponding first user module block to determine if the first host module block contains more recent information than the corresponding first user module block;

(e) if the first host module block comprises a second host module of information, comparing each second host module block to the corresponding second user module block to determine if the second host module block contains more recent information than the corresponding second user module block;

(f) downloading via the common communications channel, each host module block containing more recent information into user memory; and

(g) updating each corresponding user module block with the corresponding downloaded host module block.

(*See* '951 Patent.)

Thus, generally the invention requires three distinct network components: (1) a first computer terminal; (2) a second computer terminal; and (3) a communications channel. ('405 Patent at 4:40-43; '951 Patent at 4:48-51.) The first computer is the computer being updated with new information, the second computer is the computer

ORDER- 5

containing more recent (or new) information, and the communications channel is the medium through which the information is exchanged.  ('405 Patent at 11:12-14, 11:24-26.)

**B.     The Accused Devices[2]**

As stated, Deep9 has accused Barnes & Noble's Nook 1st Edition, Nook Color, Nook Simple Touch, and Nook Tablet devices, along with Barnes & Noble's servers, of infringement.[3]  The Nook Color, Nook Simple Touch, and Nook Tablet devices are referred to by the parties as the "Next Generation Nook devices."  These Accused Devices are electronic readers that allow a user to buy and read electronic books and other digital content.  (Sealed Dunne Decl. Ex. 9 ("Gallagher Rpt.") at 10.)  After purchasing an Accused Device, the user can store electronic content such as electronic books and magazines on his or her Nook device.  (*Id*. at 7-8, 10-11.)  Similar electronic content is also stored separately on Barnes & Noble's servers, and this content is treated as the "master" copy.  (Goldberg Rebuttal Rpt. ¶ 28.)

To make content consistent between the user's Nook device and the Barnes & Noble servers, a user of a Nook device connects his or her Nook device to Barnes & Noble's servers through the Internet to perform a "synchronization."  (Dunne Decl. (Dkt. # 139) Ex. 10 ("Nook User Guide") at 49, 100-01.)  The Nook User Guide explains the

---

[2]Many of the statements in this section rely on the contents of Barnes & Noble's motion for summary judgment.  (Mot. at 8-15.)  They do not appear to be contested by Deep9.  (Resp. at 6-7.)

[3]The Nook 1st Edition is no longer sold.  (Gallagher Rpt. at 7.)

1  button used by Nook users to synchronize the Nook device to the Barnes & Noble servers

2  and also explains how to turn on and off the wireless internet to the Nook device to allow

3  for such synchronization.  (*Id.* at 100-01.)

4        During synchronization, a Nook device compiles a list of device-side information

5  to be synced and sends a request to the Barnes & Noble servers through the Internet.

6  (Goldberg Rebuttal Rpt. ¶¶ 42-43.)  In response, the Barnes & Noble server compiles its

7  own list of server-side information to be synced, and sends its own request to the Nook

8  device through the Internet.  Diagrams of the synchronization operations for the Nook 1st

9  Edition and the Next Generation Nook devices are shown below.





(Goldberg Rebuttal Rpt., Figures 2 & 9.)  In the above two figures, the vertical line and

the arrows running through that line represent an Internet connection.

### III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

where (1) the moving party demonstrates the absence of a genuine issue of material fact

and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).  "Material," for purposes of Rule 56, means that the fact, under

governing substantive law, could affect the outcome of the case.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.

1997).  For a dispute to be "genuine," a reasonable jury must be able to return a verdict

for the nonmoving party.  *Anderson*, 477 U.S. at 248.

The initial burden of establishing the absence of a genuine issue of material fact

falls on the moving party.  *Celotex*, 477 U.S. at 323.  The movant can carry his or her

1    burden in two ways:  (1) by presenting evidence that negates an essential element of the

2    nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to

3    make a sufficient showing on an essential element of her case with respect to which she

4    has the burden of proof."  *Id.* at 322-23.  "Disputes over irrelevant or unnecessary facts

5    will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

6    *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

7         Where the moving party meets that burden, the burden then shifts to the non-

8    moving party to designate specific facts demonstrating the existence of genuine issues for

9    trial.  *Celotex*, 477 U.S. at 324.  This burden is not a light one.  The non-moving party

10   must show more than the mere existence of a scintilla of evidence.  *Anderson*, 477 U.S. at

11   252.  The non-moving party must do more than show there is some "metaphysical doubt"

12   as to the material facts at issue.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

13   475 U.S. 574, 586 (1986).  Once the moving party makes its initial showing, the non-

14   moving party "may not rest upon the mere allegations or denials of the [nonmoving]

15   party's pleading," but must provide affidavits or other sources of evidence that "set forth

16   specific facts showing that there is a genuine issue for trial" from which a jury could

17   reasonably render a verdict in the non-moving party's favor.  Fed. R. Civ. P. 56(e);

18   *Anderson*, 477 U.S. at 252.  In determining whether a jury could reasonably render a

19   verdict in the non-moving party's favor, all justifiable inferences are to be drawn in the

20   non-moving party's favor.  *Anderson*, 477 U.S. at 252.

21

22

## IV.   ANALYSIS

Barnes & Noble moves for summary judgment on two primary non-infringement grounds:  (1) Barnes & Noble does not perform or control other entities who perform all of the required steps of infringement; and (2) Barnes & Noble does not perform the "identifying" step required by each of the asserted claims.  (Mot at 7-8.)  Barnes & Noble also moves for partial summary judgment on the basis that fifteen asserted claims are anticipated by a single prior art reference.  (*Id.* at 8.)  For the reasons explained below, the court grants summary judgment in favor of Barnes & Noble because it does not itself perform all of the required steps of infringement.  Additionally, the court denies Deep9's request to amend its complaint to include a claim for induced infringement.

**A.   Non-Infringement**

**1.   Applicable Law Regarding Direct Infringement**

In the instant matter, Deep9 alleges infringement only under the theory of direct infringement.  (*See* Deep9 Infringement Contentions (Dkt. # 150-4); Deep9 Supp. Infringement Contentions (Dkt. # 150-5).)   For a party to be liable for direct patent infringement under 35 U.S.C. § 271(a), that party must commit all the acts necessary to infringe the patent, either personally or vicariously.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1568 (Fed. Cir. 1983).  In the context of a method claim, that means the accused infringer must perform all the steps of the claimed method, either personally, or through another, acting under his direction or control.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, --- F.3d ----, 2012 WL 3764695, at *2

1   (Fed. Cir. Aug. 31, 2012).  Direct infringement has not been extended to cases in which

2   multiple independent parties perform the steps of the method claim.  *Id.*  Because direct

3   infringement is a strict liability tort, it has been thought that extending liability in that

4   manner would ensnare actors who did not themselves commit all the acts necessary to

5   constitute infringement and who had no way of knowing that others were acting in a way

6   that rendered their collective conduct infringing.  *See In re Seagate Tech., LLC*, 497 F.3d

7   1360, 1368 (Fed. Cir. 2007) (en banc) ("Because patent infringement is a strict liability

8   offense, the nature of the offense is only relevant in determining whether enhanced

9   damages are warranted.").  For that reason, the Federal Circuit has rejected claims of

10  liability for direct infringement of method claims in cases in which several parties have

11  collectively committed the acts necessary to constitute direct infringement, but no single

12  party has committed all of the required acts.  *BMC Resources, Inc. v. Paymentech, L.P.*,

13  498 F.3d 1373, 1381 (Fed. Cir. 2007), overruled on other grounds by *Akamai Techs., Inc.*

14  *v. Limelight Networks, Inc.*, --- F.3d ----, 2012 WL 3764695 (Fed. Cir. Aug. 31, 2012),

15  ("Direct infringement is a strict-liability offense, but it is limited to those who practice

16  each and every element of the claimed invention."); *see also Muniauction, Inc. v.*

17  *Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008), *cert. denied*, 129 S.Ct. 1585

18  (2009).

19          To be clear, the Federal Circuit has recognized that direct infringement applies

20  when the acts of infringement are committed by an agent of the accused infringer or a

21  party acting pursuant to the accused infringer's direction or control.  *See BMC Res.*, 498

22  F.3d at 1380.  Absent an agency relationship between the actors or some equivalent,

1   however, a party that does not commit all the acts necessary to constitute infringement

2   will not be held liable for direct infringement even if the parties have arranged to

3   "divide" their acts of infringing conduct for the specific purpose of avoiding infringement

4   liability.  *See Cross Med. Prods.*, 424 F.3d at 1311 (concluding that there is no liability

5   for direct infringement if the party that is directly infringing is not acting as an agent of,

6   or at the direction of, the accused infringer).

7        **2.      Deep9's Theory of Infringement**

8        As an initial matter, the court must determine what theories of infringement are

9   appropriately alleged in this case.  It is undisputed that Deep9 proceeds under solely a

10  direct infringement theory.  The parties dispute, however, whether Deep9 can pursue a

11  joint infringement theory (where actions of multiple entities under the direction or control

12  of a single entity combine to infringe) in addition to a single-actor infringement theory

13  (where a single entity performs all the steps of claimed method).[4]  (Mot. at 17-18; Resp.

14  at 8-19 (addressing Deep9's divided infringement theory).)  Barnes & Noble contends

15  that because Deep9 has never asserted or disclosed to this point in the litigation any joint

16  direct infringement theories, Deep9 is now limited to alleging that Barnes & Noble itself

17  (and no other actors) infringe the asserted claims of the Patents-in-Suit.  (Mot. at 17-18.)

18  Although in its briefing Deep9 does not contest Barnes & Noble's assertion, at oral

19  argument, counsel for Deep9 asserted that under the notice requirements of the local

20

21  _____

22      [4]A joint infringement theory and a single-actor infringement theory are both forms of
    direct infringement.  *See Akamai*, 2012 WL 3764695, at *2.

ORDER- 12

1  patent rules, Deep9's allegations of direct, single-party infringement were sufficient to

2  place Barnes & Noble on notice of any divided infringement theory.[5]

3      Western District of Washington Local Patent Rule 120 requires a party claiming

4  patent infringement to serve on all parties a "Disclosure of Asserted Claims and

5  Infringement Contentions."  W.D. Wash. Local Patent Rule 120.  The "Disclosure of

6  Asserted Claims and Infringement Contentions" must contain:

> For each claim which is alleged to have been indirectly infringed, an
> identification of any direct infringement and a description of the acts of the
> alleged indirect infringer that contribute to or are inducing that direct
> infringement.  *Insofar as alleged direct infringement is based on joint acts*
> *of multiple parties, the role of each such party in the direct infringement*
> *must be described.*

W.D. Wash. Local Patent Rule 120(d) (emphasis added).  Accordingly, the Local Patent

Rules of this District explicitly required Deep9 to disclose any theory of joint or divided

infringement in its infringement contentions.  The court has examined Deep9's

infringement contentions and supplemental infringement contentions and finds that they

unambiguously lack any mention or allegation of joint or divided infringement.  (*See*

Deep9 Infringement Contentions at 2-3; Deep9 Supp. Infringement Contentions at 2-3.)

Thus, to this point in the litigation, Deep9 has failed to allege a theory of infringement

other than direct single-actor infringement.

    Local Patent Rule 124 allows the parties to amend infringement and invalidity

contentions "only by order of the Court upon a timely showing of good cause."  W.D.

---

[5]Counsel for Deep9 also stated that Deep9 was proceeding under primarily a direct
single-party infringement theory and that Barnes & Noble itself performed all of the steps of the
asserted claims of the Patents-in-Suit.

Wash. Local Patent Rule 124.  Non-exhaustive examples of circumstances that may,

absent undue prejudice to the non-moving party, support a finding of good cause include:

"(a) claim construction order by the Court different from that proposed by the party

seeking amendment; [and] (b) recent discovery of material, prior art despite earlier

diligent search."  *Id.*  A determination of whether good cause has been established is

within the sound discretion of the trial court.  *See MEMC Elec. Materials, Inc. v.*

*Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1380 n.5 (Fed. Cir. 2005).

This District's Local Patent Rules

> requir[e] both the plaintiff and the defendant in patent cases to provide
> early notice of their infringement and invalidity contentions, and to proceed
> with diligence in amending those contentions when new information comes
> to light in the course of discovery.  The rules thus seek to balance the right
> to develop new information in discovery with the need for certainty as to
> the legal theories.

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365-66 (Fed. Cir.

2006).  In contrast to the more liberal policy for amending pleadings, "the philosophy

behind amending claim charts is decidedly conservative, and designed to prevent the

'shifting sands' approach to claim construction."  *LG Elecs. Inc. v. Q-Lity Computer Inc.*,

211 F.R.D. 360, 367 (N.D. Cal. 2002) (citation omitted).  This District's Local Patent

Rules were "designed to require parties to crystallize their theories of the case early in the

litigation and to adhere to those theories once they have been disclosed."  *O2 Micro*, 467

F.3d at 1366 n.12 (quoting *Nova Measuring Instruments Ltd. v. Nanometrics, Inc.*, 417 F.

Supp. 2d 1121, 1123 (N.D. Cal. 2006)).

1   In determining whether good cause exists to amend, courts consider first whether

2   the moving part was diligent in amending its contentions and second whether the non-

3   moving part would suffer prejudice if the motion to amend were granted.  *REC Software*

4   *USA, Inc. v. Bamboo Solutions Corp.*, No. C11–0554JLR, 2012 WL 3527891, at *2-3

5   (W.D. Wash. Aug. 15, 2012); *Acer, Inc. v. Tech. Prop. Ltd.*, No. 08-CV-00877, 2010 WL

6   3618687, at *3 (N.D. Cal. Sept. 10, 2010) ("[The moving party] must demonstrate good

7   cause, an inquiry that considers first whether the moving party was diligent in amending

8   its contentions and then whether the nonmoving party would suffer prejudice if the

9   motion to amend were granted . . . .  If [the moving party] was not diligent, the inquiry

10  should end.").  The party seeking to amend its contentions bears the burden of

11  establishing diligence.  *O2 Micro*, 467 F.3d at 1366-67.

12   Here, Deep9 has not been diligent in moving to amend its infringement

13  contentions to include a theory of joint or divided direct infringement.  The case is over

14  18 months old, the court has issued a *Markman* ruling, the parties have conducted

15  extensive fact and expert discovery, and barely over a month remains before trial.[6]  The

16  court concludes that at this late stage of litigation, it would entirely defeat the purpose

17  behind the Local Patent Rules of requiring parties to crystallize their theories of the case

18  at an early stage of litigation to permit Deep9 to allege a theory of joint or divided direct

19  infringement.  Moreover, permitting such an amendment would greatly prejudice Barnes

20  & Noble.  Barnes & Noble has litigated this matter through the aforementioned

21

22   [6]Deep9 has not requested that the trial date be continued.  (*See generally* Dkt.)

ORDER- 15

proceedings under the assumption that Deep9 alleged only single-actor direct

infringement, and inclusion of an additional theory at this point would deprive Barnes &

Noble the opportunity to fashion its discovery and *Markman* positions to fit Deep9's

infringement theories.  Accordingly, the court concludes that Deep9 may only allege

single-actor direct infringement in this matter.  Nevertheless, as discussed below, under

either a single-actor or divided direct infringement theory, the court determines that

Barnes & Noble does not infringe the asserted claims of the Patents-in-Suit.

### 3.    Single-Actor Direct Infringement

Barnes & Noble asserts that Deep9's single-actor direct infringement theory fails

as a matter of law because Barnes & Noble does not practice the entirety of any asserted

method claim.  (Mot. at 19.)  First, Barnes & Noble contends that each asserted claim

requires a "network" or a "common communications channel," as well as a first computer

(or terminal) and a second computer (or terminal).  (*Id*. at 3.)  According to Barnes &

Noble, because it does not own or possess the Internet (which Deep9 equates to the

"network" or "common communications channel") or the Nook device (either the first or

second computer), Barnes & Noble itself cannot perform all the steps of infringement.

(*Id*. at 18-21.)  Second, making a similar argument, Barnes & Noble asserts that it cannot

perform the requisite "downloading" and "updating" steps of the asserted claims because

it does not own or possess the Internet or the Nook device, which are required to perform

the "downloading" and "updating" steps.  (*Id.* at 11; *see, e.g.*, '405 Patent, Claim 24,

Steps (d) & (e) (for "downloading" and "updating" steps).)

1    In response, Deep9 does not contest Barnes & Noble's account of the structure and

2    operation of the Accused Devices.  Rather, Deep9 asserts that Barnes & Noble itself

3    performs all the steps of infringement because all of the software in the accused Nook

4    devices was written by Barnes & Noble and designed to operate in conjunction with

5    Barnes & Noble servers.  (Resp. at 7.)  Deep9 directs the court to *Girafa.com, Inc. v. LAC*

6    *Search & Media, Inc.*, 653 F. Supp. 2d 512 (D. Del. 2009) ("*Girafa I*"), to support its

7    contention that use of the Internet does not raise the issue of a "divided infringement"

8    theory.  (Resp. at 10-11.)

9    The court agrees with Barnes & Noble and concludes that the asserted claims,

10   combined with Deep9's own theory of infringement, require multiple actors and a

11   divided infringement analysis.  Here, Deep9's own infringement expert, Stephen Gray,

12   explains that Deep9's theory of infringement requires three separate components:  (1) a

13   Nook device; (2) a connection to the Internet; and (3) the Barnes & Noble servers.  Mr.

14   Gray states his theory of infringement as follows:

15       Nook 1st Edition System consisting of the Nook 1st Edition Devices and
         the BN Servers comprise "a configuration of nodes where information is
16       stored in more than one place" and connect via at least one common
         communications channel, e.g., the Internet.

17   (Sealed Dunne Decl. Ex. 11 ("Gray Infringement Rpt.") ¶ 80.)  With respect to the Next

18   Generation Nook devices, Mr. Gray opines:

19
         The Nook Color Device and the NY Backend Server and BN Cloud Server
20       (collectively, the BN Servers) comprise the Nook Color System.  The Nook
         Simple Touch Device and the BN Servers comprise the Nook Simple
21       Touch System.  The Nook Tablet Device and the BN Servers comprise the
         Nook Tablet System.  Collectively, I refer to these three systems as the
22       Next Generation Nook Systems.

ORDER- 17

*****

Each of the Nook Systems comprises "a configuration of nodes where information is stored in more than one place" and connect via at least one common communications channel, e.g., Wi-Fi and the Internet. Each of these is a common communications channel.

(*Id.* ¶¶ 92 & 99.)

As stated, Deep9's own expert asserts a theory of infringement requiring three separate components to meet the steps of infringement required by the asserted claims. Deep9 contends, however, that all three components are met by Barnes & Noble's own actions in writing the code for the Nook devices and Barnes & Noble's ownership of the servers. The court disagrees. Critical to the court's conclusion is Mr. Gray's theory that infringement only occurs through synchronization between Barnes & Noble servers and the Nook device. Mr. Gray testified at his deposition that a user could turn off the internet connection on the Nook device, which would preclude connection to the network or common communications channel, and preclude synchronization. (Sealed Dunne Decl. Ex. 15 at 27, 100:8-19.)   Additionally, during oral argument, counsel for Deep9 admitted that if the user of the Nook device did not connect to the Internet, no synchronization and no infringement would occur. Indeed, Deep9 counsel stated that without connection to the Internet, the Nook device would be gathering dust as opposed to performing one or more of the patented steps. Accordingly, the Nook User Manual explains to users how to turn on Wi-Fi networking on the user's Nook device. (Nook User Guide at 100.) Thus, not only does Deep9's infringement theory require three separate components, it also requires a user to act upon one of those components to set in

1    motion the patented steps required by the asserted claims—in particular, the

2    "downloading" and "updating" steps.  In other words, action by the user is required for

3    infringement under Deep9's theory.

4         Additionally, the court is not persuaded that *Girafa I*, cited by Deep9, dictates a

5    single-actor direct infringement analysis under the facts of this case, as Deep9 contends.

6    At the outset, the court notes that Deep9 cites *Girafa I* to support its contention that

7    involvement of the Internet in a method claim does not implicate a divided infringement

8    analysis.  (Resp. at 11 ("The [*Girafa I*] ruling is directly on point as to B&N's argument

9    concerning the Internet.").)  Here, the court's finding that Deep9's infringement theory

10   requires a divided infringement analysis is predicated not on the involvement of the

11   Internet, but on the involvement of a user of the Nook device in the requisite

12   infringement steps.  Indeed, Deep9 agrees that if the court determines that operation by a

13   Nook device user is necessary to practice of the asserted claims, *Girafa I* would not

14   dictate a single-actor infringement analysis.  (*See id.* at 10.)

15        Importantly, although the court in *Girafa I* denied the defendant's motion for

16   summary judgment on the grounds that the patent at issue did not require multiple

17   individuals or entities to complete all the claimed steps, 653 F. Supp. 2d, at 525-26, the

18   court later revisited its claim construction, and under the revised claim construction found

19   that performance of the claimed method required multiple parties' participation.

20   *Girafa.com, Inc. v. IAC Search & Media, Inc.*, No. 07–787–SLR, 2009 WL 3074712, at

21   *1-2 (D. Del. Sept. 25, 2009) ("*Girafa II*").  In particular, upon further review, the *Girafa*

22   *II* court found that the invention was directed to the display of images to the *user*, thereby

ORDER- 19

1   requiring a second entity to perform all of the claimed steps.  *Id.*  The *Girafa II* court then

2   granted summary judgment on a divided infringement theory.  2009 WL 3074712, at *3.

3   Thus, consistent with this court's finding, *Girafa I* and *Girafa II* indicate that when claim

4   limitations and infringement theories require multiple actors to perform all claimed steps,

5   a divided infringement analysis is appropriate.

6         This court finds that the present case is closely analogous to *McKesson*

7   *Information Solutions LLC v. Epic Systems Corp.*, No. 1:06-CV-2965-JTC, 2009 WL

8   2915778 (N.D. Ga. Sept. 8, 2009), *overruled on other grounds by Akamai*, 2012 WL

9   3764695, and *Global Patent Holdings, LLC v. Panthers BRHC LLC*, 586 F. Supp. 2d

10   1331 (S.D. Fla. 2008), *aff'd*, 318 Fed. Appx. 908 (Fed. Cir. 2009).  The *McKesson* case

11   involved "MyChart," which is a software system provided to health care patients to

12   access certain information from their healthcare providers, such as the patient's medical

13   records, treatment information, and scheduling information.  2009 WL 2915778, at *2.

14   The initial step of "initiating a communication" on MyChart was performed by a patient

15   or other user, not by a healthcare provider, whereas other steps of the patent at issue were

16   performed by the healthcare provider.  *Id.* at *6.  Patients were free to choose whether to

17   initiate a communication and log into MyChart; healthcare providers who use MyChart

18   did not require their patients to sign up for or to use MyChart.  *Id.* at *2.  The parties in

19   *McKesson*, thus, agreed that a divided infringement theory was necessary.  *Id.* at *6.

20         Similarly, in *Global Patent Holdings*, the patent at issue claimed a "method for

21   downloading responsive data from a remote server."  586 F. Supp. 2d at 1333 n.1.  The

22   plaintiff alleged that the defendant infringed the method claim "by downloading

ORDER- 20

1   responsive data, including audio/visual and graphical representations, such as JPEG

2   images and/or other compressed data, on its website." *Id.* at 1333.  Although the plaintiff

3   alleged that the infringement took place through the joint action of both the defendant and

4   the website user, the court concluded that a divided infringement theory was appropriate

5   because "[i]f no person ever visited Defendant's website, then Plaintiff's patent would

6   never be infringed." *Id.* at 1335.

7          The instant case is factually similar to both *McKesson* and *Global Patent*

8   *Holdings*.  Just like the user of MyChart in *McKesson*, a user of the Nook device is free to

9   connect to his or her Nook device to the Internet, thus allowing for the patented

10  "downloading" and "updating" steps to occur.  And, just like the website user in *Global*

11  *Patent Holdings*, the user of the Nook device is a necessary actor in Deep9's theory of

12  infringement, which requires the Nook device user to connect the device to the Internet to

13  practice the "downloading" and "updating" steps of the asserted claims.  Thus, without a

14  user connecting his or her own Nook device to the Internet, the asserted claims of the

15  Patents-in-Suit would never be infringed.  Accordingly, Deep9's theory of infringement,

16  combined with the operation of the Accused Devices, squarely aligns this case *McKesson*

17  and *Global Patent Holdings* and requires a divided infringement analysis.  As a result,

18  Deep9's single-actor direct infringement theory, accusing Barnes & Noble itself of

19  performing all of the claimed steps of the Patents-in-Suit fails as a matter of law, and the

20  court grants summary judgment of non-infringement to Barnes & Noble with respect to

21  all independent method claims asserted by Deep9—claims 1 and 40 of the '405 Patent

22  and claims 9, 18, 27, and 35 of the '951 Patent.

1      **4.**      **Divided Infringement**

2      Even if it were appropriate to allow Deep9 to asserted a divided infringement

3 theory at this late stage in the litigation, the court would still grant summary judgemtn to

4 Barnes & Noble.

5      In *BMC Resources*, the United States Court of Appeals for the Federal Circuit

6 addressed "the proper standard for joint infringement by multiple parties of a single

7 claim." 498 F.3d at 1378. "Direct infringement requires a party to perform or use each

8 and every step or element of a claimed method or product." *Id.* (internal citations

9 omitted). As stated above, in the context of method patent claims, "infringement occurs

10 when a party performs all of the steps of the process." *Id.* at 1379. However:

11     A party cannot avoid infringement . . . by contracting out steps of a
    patented process to another entity. In those cases, the party in control

12     would be liable for direct infringement. It would be unfair indeed for the
    mastermind in such situations to escape liability.

13 *Id.* at 1381. Thus, under *BMC Resources*, a party may be held liable for infringing a

14 method patent claim when that party either performs each step of the patented method or

15

16

17

18

19

20

21

22

ORDER- 22

1    when that party "directs and controls" the performance of any step of the patented

2    method that it does not perform itself.[7]  *Id.*

3         Case law following *BMC Resources* has clarified the "directs and controls"

4    standard.  *See Muniauction*, 532 F.3d at 1329-30; *Global Patent Holdings*, 586 F. Supp.

5    2d. at 1333-34.  The Federal Circuit's decision in *Muniauction* instructs that controlling

6    access to an online method and teaching users on how to use the method is insufficient

7    evidence of direction and control.  The patent at issue in *Muniauction* claimed "electronic

8    methods for conducting 'original issuer auctions of financial instruments.'"  *Muniauction*,

9    532 F.3d at 1321.  The method was directed to municipal bond auctions, which were to

10   be conducted over the internet.  *Id.*  The patent provided an integrated system on a single

11   server which allowed "[bond] issuers to run the auction and bidders to prepare and submit

12   bids using a conventional web browser, without the use of other separate software."  *Id.*

13   at 1322.  The parties agreed that no single party performed every step of the asserted

14   claims because the "inputting step" of the patented method required "inputting data

15   associated with at least one bid for at least one fixed income financial instrument into

16   said bidder's computer via said input device."  *Id.* at 1328-29 n.5.

17   _____

18   [7]*BMC Resources*' holding that induced infringement required not only a showing of
     direct infringement, but that the direct infringement be committed by a single actor, was recently
19   overruled by *Akamai*, 2012 WL 3764695, at *4.  The *Akamai* court, however, explicitly stated
     that its decision to overturn *BMC Resources*' single-actor infringement requirement for induced
     infringement in no way altered the doctrine of direct infringement and the "principles regarding
20   the law of divided infringement as it applies to liability for direct infringement under 35 U.S.C. §
     271(a)."  *Id.* at *3.  Because Deep9 proceeds in this matter under only a theory of direct
21   infringement—and not induced infringement, or any other form of indirect infringement—this
     court proceeds with the understanding that the holding of *BMC Resources* regarding "direction
22   or control" in the context of divided or joint direct infringement, as set forth in the body of this
     order, remains controlling precedent.

1    In *Muniauction*, the Federal Circuit restated the rule set forth in *BMC Resources*

2    that "where the actions of multiple parties combine to perform every step of a claimed

3    method, the claim is directly infringed only if one party exercises 'control or direction'

4    over the entire process such that every step is attributable to the controlling party, i.e., the

5    'mastermind.'" *Id.* at 1329 (citing *BMC Res.*, 498 F.3d at 1380-81).  The issue before the

6    *Muniauction* court was whether the auctioneer sufficiently controlled or directed the

7    actions of the bidder—in inputting the bidder's bid on the bidder's computer—such that

8    the auctioneer could be said to have performed every step of the patented method.  *Id.*

9    The *Muniauction* court held that the defendant did not perform every step of the claimed

10   method nor did another party perform the steps on its behalf, and that, therefore, the

11   defendant did not infringe the asserted method claim as a matter of law.  *Id.* at 1330.  The

12   court explained:

13           Under *BMC Resources*, the control or direction standard is satisfied in
             situations where the law would traditionally hold the accused direct
14           infringer vicariously liable for the acts committed by another party that are
             required to complete performance of a claimed method.
15
16   *Id.*  Critically, the court noted that the fact that the defendant "controls access to its

17   system and instructs bidders on its use is not sufficient to incur liability for direct

18   infringement." *Id.*

19           In *Global Patent Holdings* (discussed *supra* § IV.A.3), the plaintiff alleged that

20   the defendant directed and controlled the website user by sending a set of computer

21   programs to the user's computer through the defendant's website.  586 F. Supp. 2d at

22   1333.  The defendant moved to dismiss the complaint on the grounds that the plaintiff

1   had not alleged that the defendant either performed every step of the claimed method or

2   directed and controlled the user in performing any steps not performed by the defendant.

3   *Id.*  After discussing the holdings in *BMC Resources* and *Muniauction*, the *Global Patent*

4   *Holdings* court granted the defendant's motion to dismiss.  *Id.* at 1334-36.  In so doing,

5   the court found that the plaintiff failed to allege sufficient facts to suggest that the

6   defendant directed or controlled the user in visiting the website.  *Id.* at 1335.  The court

7   noted that putting "Javascript programs on the remote user's computer to allow the

8   process to begin" was insufficient to show direction or control.  *Id.*  In addition, the

9   plaintiff did not allege that "remote users are contractually bound to visit the website,"

10  that "remote users are Defendant's agents who visit the website within the scope of their

11  agency relationship," or any other "facts which would render Defendant otherwise

12  vicariously liable for the acts of the remote user."  *Id.*

13          Based on *BMC Resources*, *Muniauction*, and *Global Patent Holdings*, the court

14  concludes that the level of "direction or control" intended by the Federal Circuit is

15  significantly higher than mere guidance or instruction of how to conduct some of the

16  steps of a method claim.  Instead for a court to find "direction or control," the second

17  individual or entity must perform the steps of the asserted claims through a contractual

18  obligation or other relationship that gives rise to vicarious liability of the accused

19  infringer.

20          Here, Deep9 asserts that Barnes & Noble directs and controls users of Nook

21  devices because (1) Barnes & Noble's terms of service require users to open a Barnes &

22  Noble account and register the Nook device; and (2) Barnes & Noble retains ownership

ORDER- 25

1    of the software resident on the user's Nook device.  (Resp. at 13.)  Even taken as true,

2    Deep9's allegations do not demonstrate a relationship between Barnes & Noble and the

3    user of a Nook device sufficient to meet the standard for direction or control explained

4    above.

5         First, any requirement upon the user to open a Barnes & Noble account and

6    register the Nook device in no way relates to whether Barnes & Noble directs or controls

7    the user in connecting the Nook device to the Internet.  *See McKesson*, 2009 WL

8    2915778, at *5 (concluding that terms and conditions in software license did not

9    constitute direction and control because users were not under any obligation to perform

10   any action).  Indeed, the terms of service explicitly disavow control over the user with

11   respect to connection of the Nook device to the Internet.  (Terms of Service (*available* at,

12   www.nookcolor.com/legal) at 1(d) ("You can choose to connect or disconnect at any

13   point to a different Wi-Fi hotspot and thus choose a different ISP service.").)  Moreover,

14   any registration requirement of Barnes & Noble does not contractually obligate a user to

15   connect to the Internet to synchronize its Nook device or otherwise create an agency

16   relationship, such that the user is acting on behalf of Barnes & Noble.  In fact, a user's

17   choice to connect his or her Nook device to the Internet would serve the interest of the

18   user, as opposed to the interest of Barnes & Noble.

19        Second, the fact that Barnes & Noble provides and retains ownership of the

20   software resident on the user's Nook device is insufficient, as a matter of law, to

21   demonstrate direction or control over the user.  *Centillion Data Sys, LLC v. Qwest*

22   *Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286 (Fed. Cir. 2011) ("While Qwest may make the

1   bend-end processing elements, it never "uses" the entire claimed system because it never

2   puts into service the personal computer data processing means.  Supplying the software

3   for the customer to use is not the same as using the system."); *Global Patent Holdings*,

4   586 F. Supp. 2d at 1335 (concluding that provision of computer program on user's

5   computer was insufficient to show direction or control).  In sum, Deep9 has failed to

6   allege legally sufficient facts to show direction or control by Barnes & Noble over a

7   user's choice to connect his or her Nook device to the Internet.  Because infringement

8   under Deep9's theory cannot occur without such user connection, Deep9 cannot

9   demonstrate that Barnes & Noble controls or directs each step of the asserted claims of

10  the Patents-in-Suit.  Accordingly, the court would grant summary judgment in favor of

11  Barnes & Noble even if it were to permit Deep9 to proceed with its divided infringement

12  theory.

13      **5.**      ***Beauregard* Claim**

14          In addition to asserting method claims, Deep9 asserts a single independent system

15  claim, claim 24 of the '405 Patent (*supra* § II.A).  Claim 24 is what is known as a

16  *Beauregard* claim.  *See In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995).  A *Beauregard*

17  claim is one that recites an article of manufacture that is embodied in a computer-

18  readable medium such as a disk or CD.  It is named after the *In re Beauregard* decision,

19  in which the Federal Circuit officially recognized the United States Patent and Trademark

20  Office Commissioner's position "that computer programs embodied in a tangible

21  medium, such as floppy diskettes, are patentable subject matter under 35 U.S.C. § 101."

22  *In re Beauregard*, 53 F.3d at 1584.  Claim 24 constitutes a *Beauregard* claim because it

1  merely discloses the embodiment of the method of Claim 1 in a computer readable

2  medium encoded with a set of instructions to perform the method of Claim 1.  (*Compare*

3  '405 Patent at Claim 24 *with* '405 Patent at Claim 1.)

4        With respect to Claim 24, Deep9 offers the same theory of infringement as it

5  offered for Claim 1:

6          This claim is infringed on the same basis as claim 1, insofar as the Nook
        System includes software encoded as executable instructions stored on a

7          computer readable medium for performing method described in claim 1 is
        [sic].  The Nook Device and the BN server each contain computer readable

8          media with executable instructions encoded thereon.

9  (Gray Infringement Rpt. Ex. A at A8, Ex. B at B6.)  Because Claim 24 is simply an

10  embodiment of Claim 1 encoded in a computer medium and because Deep9 offers the

11  same theory of infringement for both claims, the court finds that Barnes & Noble does

12  not infringe the *Beauregard* claim for essentially the same reasons the court found non-

13  infringement under a divided infringement theory for all method claims.  Although Mr.

14  Gray appears to assert that all of the instructions to perform the method disclosed in

15  Claim 1 reside on the Accused Devices, thereby infringing Claim 24, the evidence before

16  the court precludes such a conclusion.

17        Again, Deep9's theory of infringement requires at least one user to assist in

18  performing all of the method steps of Claim 1 by connecting the Nook device to the

19  Internet.  Additionally, under Deep9's theory of infringement, the Internet reads onto the

20  "common communications channel" limitation of Claim 1.  (Gray Infringement Rpt. Ex.

21  B at B6 ("Wi-Fi and the Internet are both shared data transmission channels.").)  Here,

22  Barnes & Noble makes clear through the Nook User Guide and the terms of service that it

ORDER- 28

1    is the user's choice as to what internet service provider to use.  Thus, Barnes & Noble

2    cannot provide the required "common communications channel" limitation, but instead

3    the user must provide that limitation.  In other words, logically, Barnes & Noble cannot

4    provide each and every limitation required by the system disclosed in Claim 24 because it

5    does not provide the "common communications," i.e., the Internet.[8]  Accordingly, the

6    court grants summary judgment of non-infringement in favor of Barnes & Noble with

7    respect to Claim 24 of the '405 Patent.

8    **B.    Amendment to Pleadings**

9           In a two-paragraph, September 4, 2012, letter to the court, Deep9 referenced the

10   Federal Circuit's ruling in *Akamai*, 2012 WL 3764695, and sought leave to file a motion

11   to amend its complaint to include a claim for induced infringement.  (9/4/12 Letter (Dkt.

12   # 251).)  Generally, a motion for leave to amend a complaint would be governed by

13   Federal Rule of Civil Procedure 15(a), which liberally allows amendments to pleadings.

14   *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend pleadings]

15   when justice so requires.").  However, if the court enters a pretrial scheduling order that

16   sets a deadline to amend pleadings and a party moves to amend a pleading after the

17   deadline, the court evaluates the motion to amend under Federal Rule of Civil Procedure

18   16 and its "good cause" standard.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294

19

20          [8]In a system claim, "[t]he infringement analysis is a two step inquiry.  'First, the court
21   determines the scope and meaning of the patent claims asserted, and then the properly construed
     claims are compared to the allegedly infringing device.'"  *Cordis Corp. v. Boston Scientific
22   Corp.*, 658 F.3d 1347, 1354 (Fed. Cir. 2011) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d
     1448, 1454 (Fed. Cir. 1998) (en banc)).

1    (9th Cir. 2000).  If the party seeking to modify the scheduling order to amend its

2    pleadings demonstrates good cause under Rule 16(b), then it must also demonstrate that

3    the amendment is proper under Rule 15 standards.  *See Johnson v. Mammoth*

4    *Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1991).  Here, this case is less than five

5    weeks before trial, and the deadline for amending pleadings has long passed.

6    Accordingly, the court will first evaluate Deep9's request to amend under Rule 16(b), and

7    then, if necessary, under Rule 15(a).

8         The "good cause" standard of Rule 16 is more exacting than the Rule 15(a)

9    standard:

10        A court's evaluation of good cause is not coextensive with an inquiry into
          the propriety of the amendment under . . . Rule 15.  Unlike Rule 15(a)'s
11        liberal amendment policy which focuses on the bad faith of the party
          seeking to interpose an amendment and the prejudice to the opposing party,
12        Rule 16(b)'s "good cause" standard primarily considers the diligence of the
          party seeking the amendment.  The district court may modify the pretrial
13        schedule "if it cannot reasonably be met despite the diligence of the party
          seeking the extension."
14
15   *Johnson*, 975 F.2d at 609 (citations omitted).  A party meets Rule 16's good cause

16   standard if it shows that, despite its diligence, it was unable to uncover the information

17   underlying its motion to amend.  *Id.*

18        Here, Deep9 seeks to amend its pleadings to include a claim of induced

19   infringement in light of the Federal Circuit's ruling in *Akamai*, 2012 WL 3764695 that

20   overturned *BMC Resources*'s holding that induced infringement required proof of direct

21   infringement by a single actor.  498 F.3d at 1378.  The *Akamai* court stated:

22        If a party has knowingly induced others to commit the acts necessary to
          infringe the plaintiff's patent and those others commit those acts, there is no

> reason to immunize the inducer from liability for indirect infringement
> simply because the parties have structured their conduct so that no single
> defendant has committed all the acts necessary to give rise to liability for
> direct infringement.

2012 WL 3764695, at *4. Thus, the Federal Circuit extended the doctrine of induced
infringement to cover circumstances where (1) a defendant induced others to engage in
acts that collectively practice the steps of a patented method, and (2) a defendant himself
performed some of the claimed steps and induced another to perform the remaining steps
to constitute infringement. *Id.*

Presumably, Deep9 seeks to amend its pleadings to include an induced
infringement claim on the premise that Barnes & Noble induced the user of the Nook
device to perform some or all of the steps of the asserted claims of the Patents-in-Suit.
Such a theory would be entirely contradictory to the theory presented by Deep9 to this
point, which has focused solely on a single-actor direct infringement theory.  In other
words, for the past 18 months, Deep9 has alleged that Barnes & Noble itself performed
each and every claimed step, but now it seeks to assert that someone other than Barnes &
Noble performed at least some of the steps.  Had Deep9 desired to proceed under a
multiple actor theory of infringement, it could have amended its complaint or
infringement contentions to include a theory of divided direct infringement, thereby, at a
minimum, placing Barnes & Noble on notice of its theory of the case.  A divided direct
infringement theory was available to Deep9 at all times since commencement of this
litigation, and certainly prior to the Federal Circuit's ruling in *Akamai*.

1        Moreover, Deep9's complaint is void of facts that could support a claim of

2 induced infringement.  At best, Deep9's complaint alleges that under 35 U.S.C. § 271(a),

3 "Barnes & Noble directly infringes" the Patents-in-Suit by selling, offering for sale,

4 and/or using the Accused Devices.  (Am. Compl. (Dkt. # 70) ¶¶ 12, 17.)  Such conclusory

5 factual allegations in no way suggest that Deep9 intended to assert that entities other than

6 Barnes & Noble acted to practice the claimed steps.  In fact, the allegations of the

7 complaint dispel any such notion by stating a theory of "direct" infringement under 35

8 U.S.C. § 271(a).  In sum, permitting amendment to include an induced infringement

9 claim would fundamentally alter the theory of infringement and the factual underpinnings

10 developed in this matter, both of which could have been developed at an earlier stage in

11 the litigation.  Thus, the court does not find that Deep9 has shown diligence or good

12 cause to amend its complaint to include a claim of induced infringement, and denies its

13 request to amend.[9]

14  

---

15     [9]Additionally, even if Deep9 had shown good cause, the court would deny leave to

16 amend under Rule 15 because inclusion of an induced infringement claim at this point in the litigation would greatly prejudice Barnes & Noble.  As documented above, this case is now less than five weeks from trial.  The parties have engaged in extensive fact and expert discovery, as

17 well as motions practice.  The court has also provided a *Markman* order construing disputed terms of the Patents-in-Suit.  Through all of these proceedings, Barnes & Noble has been under

18 the assumption that Deep9 alleged only single-actor direct infringement.  To now include a claim of induced infringement, which requires different elements of proof from direct infringement,

19 would require the court to re-open proceedings to allow additional fact and expert discovery and, in fairness, additional *Markman* proceedings.  Barnes & Noble would be prejudiced by the delay

20 in resolution of this case and by the extensive additional work that would be necessary were the court to permit amendment.  Such prejudice is unjust considering that Barnes & Noble has

21 already extensively litigated this matter pursuant to the allegations set forth by Deep9 in its complaint, amended complaint, infringement contentions, and supplemental infringement

22 contentions.

ORDER- 32

1

## V.   CONCLUSION

2          Based on the foregoing, the court GRANTS Barnes & Noble's motion for

3  summary judgment of non-infringement (Dkt. # 146).[10]  Because of the court's ruling

4  granting summary judgment of non-infringement in favor of Barnes & Noble, the court

5  DENIES Deep9's motion for summary judgment of infringement against Barnes & Noble

6  (Dkt. # 132).  Additionally, this ruling results in final judgment in favor of Barnes &

7  Noble, and accordingly the court STRIKES as moot all motions remaining on the docket

8  for this matter.

9          Dated this 21st day of September, 2012.

10

11

12          _____
            JAMES L. ROBART
13          United States District Judge

14

15

16

17

18

19

20  _____

21     [10]The court's finding that Barnes & Noble does not infringe any of the asserted method
    claims or the single asserted system claim renders all remaining issues raised by the parties'
22  summary judgment briefs moot.  Accordingly, the court declines to examine these remaining
    issues.

ORDER- 33